FILED
2016 Sep-06 PM 01:16
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **LAURA TALLEY,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:14-cv-02325-RDP** |
| | } | |
| **TRITON HEALTH SYSTEMS, LLC,** | } | |
| | } | |
| **Defendant.** | } | |

**MEMORANDUM OPINION**

## I. Introduction

Plaintiff Laura Talley ("Plaintiff" or "Talley") filed this action against Defendant, Triton Health Systems, LLC ("Defendant" or "Triton") asserting claims of interference and retaliation under the Family Medical Leave Act ("FMLA"). The case is presently before the court on cross Motions for Summary Judgment (Docs. # 14 and 17). Also before the court are Defendant's Motion To Strike (Doc. # 19), and Plaintiff's Motion To Strike or, in the Alternative, Motion In Limine (Doc # 32). The Motions are fully briefed. (*See* Docs. # 14 through 17, 19, and 24 through 35). For the following reasons, the parties' Motions to Strike and Plaintiff's Motion for Summary Judgment are due to be denied, and Defendants Motion for Summary Judgment is due to be granted.

## II. Background[1]

Triton is the parent company of VIVA Health, Inc. ("VIVA"), a health insurance company that provides employer group health insurance plans and private Medicare coverage to individuals in Alabama. (Doc. # 16-1 at ¶ 2).

### A. Defendant's FMLA Policy

Triton is a covered employer under the FMLA. (Doc. # 1 at ¶ 5; Doc. # 4 at ¶ 5). It maintains a FMLA Policy, which Plaintiff received and with which she agreed to comply. (Doc. # 16-1 at ¶ 4; Doc. # 16-2 at 50:4-53:1, 54:11-55:2, Exs. 8-10, Ex. 11 at pp. 39-43). Plaintiff understood that, under that Policy, FMLA leave is not automatic. (Doc. # 16-2 at 55:3-7, Ex. 11 at pp. 40-41; Doc. # 16-1 at ¶ 4). To qualify for FMLA leave, employees at Triton must first complete and submit an application for leave to Human Resources ("HR"), accompanied by a certification of a serious health condition. (Doc. # 16-1 at 55:8-56:15, Ex. 11 at pp. 40-42; Doc. # 1 at ¶¶ 4-5). Without following these steps, leave will not be approved. (*See id.*).

### B. Plaintiff's Employment with Defendant

Plaintiff worked for Triton as Director of Quality Improvement from October 31, 2011, until her termination on August 8, 2013. (Doc. # 16-2 at 45:8-20, 46:6-11, 76:23-77:6, Ex. 6; Doc. # 19-1 at ¶ 3). She reported directly to Executive Director for Medicare Revenue and Quality Management, Lesley Weir. (Doc. # 16-2 at 49:7-12; Doc. # 16-3 at 17:15-18:6; Doc. # 16-4 at ¶¶ 2-3; Doc. # 16-5 at ¶ 2). Weir, in turn, reported directly to Vice President of

[1] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the undisputed "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Admr. U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994). The court notes where facts are disputed.

Corporate Development Libba Yates. (Doc. # 16-2 at 49:13-18; Doc. # 16-4 at ¶ 2; Doc. # 16-5 at ¶ 2).

In her role as Director of Quality Improvement, one of Plaintiff's primary functions and responsibilities was to manage the five employees working in the Quality Improvement ("QI") department. (Doc. # 16-2 at 46:17-48:21, Ex. 7; Doc. # 16-3 at 21:11-20; Doc. # 16-4 at ¶ 3; Doc. # 29-2 at ¶ 4). She understood that her performance as a manager required positive communication skills and productive interaction with subordinates and co-workers. (Doc. # 16-2 at 46:17-48:21, 80:19-22, 81:6, Ex. 7). Plaintiff also served as a strategic planner for the QI department's functions. (Doc. # 16-4 at ¶ 3).

Plaintiff underwent two performance reviews during her employment with Defendant. (Doc. # 16-3 at 35:10-47:7, Ex 1 at pp. 000093-94, 120-24, 238-43). Both reviews were conducted by Weir. (*Id.*; Doc. # 16-3 at 29:4-6). The reviews reflect that Plaintiff competently performed her substantive job duties, meeting or exceeding her employer's expectations. (Doc. # 16-3 at 35:10-47:7, Ex 1 at pp. 000093-94, 120-24, 238-43). Plaintiff says that she "had always received positive feedback from Ms. Weir." (Doc. # 19-1 at ¶ 19). She also testified that she "had never been disciplined or counseled." (*Id.*).

In her declaration Weir states that, beginning in Plaintiff's first week of employment, despite the content of her performance reviews, she held conversations with Plaintiff "about her style and approach to co-workers and subordinates." (Doc. # 16-4 at ¶ 4). Weir reports that Plaintiff's "style was very curt and rough and was frequently perceived as negative and unnecessarily hostile," and other employees at Triton told Weir they did not enjoy working with Plaintiff, and disliked her tone and attitude in regular, daily communications. (*Id.*). Yates notes

in her declaration that she was aware of, and displeased with, Plaintiff's interactions with co-workers. (Doc. # 16-5 at ¶ 3).

Weir testified she constantly coached Plaintiff "on her style and demeanor." (Doc. # 16-4 at ¶ 5). Weir explained that she did not address her concerns about Plaintiff through written reprimands or in a disciplinary way out of respect to Plaintiff and her position. (*Id.*). At her deposition, Weir testified that, while she could not recall if she had put anything negative in writing concerning Plaintiff's performance, VIVA would have had any such written documentation on file. (Doc. # 16-3 at 47:8-21).

In her declaration, Weir also stated that Plaintiff's demeanor and behavior never improved, and that Weir continued to receive comments and complaints from Plaintiff's peer-level co-workers. (Doc. # 16-4 at ¶ 5). Specifically, Doug Cannon, a Vice-President at VIVA, and Danielle Brown, VIVA's Associate Director of Care Management, told Weir that they did not appreciate the manner in which Plaintiff communicated with others. (*Id.* at ¶ 4). The "Director [of Provider Engagement], Carol Davis, told [Weir] she would simply not work with [Plaintiff] any longer." (*Id.*; *see also* Doc. # 16-6 at 12:6-15).

Weir explained that in April 2013, while preparing for a meeting with management-level employees at VIVA, Plaintiff "included highly critical and personal comments about upper-level management" in the agenda without consulting Weir. (Doc. # 16-4 at ¶ 8). "A co-worker expressed concerns with [Plaintiff's] decision to include those comments, but she disregarded them." (*Id.*). Weir had "multiple conversations" with Plaintiff about Plaintiff's lack of judgment in preparing for that meeting and how it related to her communication problems with co-workers that Weir and Plaintiff had discussed. (*Id.*). Plaintiff denies ever making comments of a "personal" nature about anyone (Doc. # 29-2 at ¶ 11), and says that, during her employment with

Defendant, she was "never counseled, disciplined or otherwise made aware that any employee had a problem working with me." (Doc. # 29-2 at ¶ 7).

According to Defendant, Plaintiff also began having problems related to her attendance and punctuality.[2] (Doc. # 16-4 at ¶ 7). Plaintiff missed "a couple" of meetings that Yates scheduled and that other managers were required to attend. (*Id.*). On multiple occasions, Plaintiff arrived at work at 10:00 a.m., or slightly later. (*Id.* at ¶ 9; Doc. # 16-2 at 88:2-4, 93:10-14, Ex. 17). Weir also reported that, on several occasions, Plaintiff was late or completely missed meetings that she had scheduled and was responsible for conducting, and offered no excuse or explanation as to why she was late or missed the meetings. (Doc. # 16-4 at ¶ 7; Doc. # 16-2 at Ex. 17 at p. 000199; *see also* Doc. # 16-2 at 90:22; Doc. # 16-5 at ¶ 3). In her declaration, Yates notes that she observed and was displeased with Plaintiff's work attendance. (Doc. # 16-5 at ¶ 3; *see also* Doc. # 16-4 at ¶ 7).

Weir talked with Plaintiff about her absence and tardiness issues "several times," and told her to establish a schedule for herself. (Doc. # 16-4 at ¶ 9; Doc. # 16-2 at 88:16-89:1). However, Plaintiff's first-year performance review states that she was "in good standing with the attendance policy" (Doc. # 16-2 at Ex. 1 at p. 000122), and her second-year review states that she "consistently adheres to all departmental and company policies." (*Id.* at p. 000240). Weir excused some of Plaintiff's absences when an excuse was provided. (Doc. # 19-3 at pp. 000224-25, 229-31, 233; Doc. # 16-2 at Ex. 17 at pp. 000224-25, 229-31, 23).

[2] Plaintiff understood that her position not only required punctual and regular attendance, but also compliance with Triton's Attendance Policy, which instructed every employee of Triton to maintain both the attendance and punctuality necessary to perform her job duties, or face discipline up to and including termination. (Doc. # 16-2 at 53:18-54:10, 87:1-9). The Attendance Policy contained in VIVA's Employee Handbook. (Doc. # 16-2 at Ex. 11, pp. 46-47). The court's reading of Defendant's summary judgment motion indicates that Defendant has not relied on any issues with Plaintiff's attendance to explain its termination decision.

Plaintiff scheduled an appointment with Yates for July 25, 2013, while her supervisor Weir was on vacation. (Doc. # 16-5 at ¶ 3; Doc. # 16-2 at 95:2-8). At their meeting, Plaintiff told Yates that she wanted to take on other programs and create a new department with a different structure so that QI and Care Management would be under the same leadership. (Doc. # 16-5 at ¶ 3; Doc. # 16-2 at 95:6-97:20). Plaintiff's restructuring proposal contemplated a new reporting structure that could have potentially removed QI from Weir's supervision, although Plaintiff also acknowledged there was a possibility that Weir could have been the supervisor of this newly proposed department. (*Id.*). Yates felt that Plaintiff was going behind Weir's back and attempting to remove QI from under Weir's supervision, thereby diminishing Weir's authority and responsibility. (Doc. # 16-5 at ¶ 3). Yates told Plaintiff that she was surprised Plaintiff would want to take on additional tasks because she "had personally observed her inability to get to work on time and show up for meetings." (*Id.*; Doc. # 16-4 at ¶ 11). When Weir found out about Plaintiff's meeting with Yates, Weir was "upset and disappointed," and believed Plaintiff had gone over her head in an "attempt to poison" her with Yates out of a reaction to her criticisms and counseling. (Doc. # 16-4 at ¶¶ 11-12).

Plaintiff testified that she had issues with Weir's management style, although she did not complain to any of her superiors about that style. (Doc. # 16-2 at 98:2-6). Plaintiff had asked her QI staff to come to her first with any issues, instead of going directly to Weir. (Doc. # 16-2 at 99:10-23; Doc. # 16-4 at ¶ 12). Plaintiff had told Weir that she was "sick of people going over [her] head" to complain. (Doc. # 16-4 at ¶ 12).

On July 31, 2013, Weir and Yates discussed (first over email because Yates was out of the office) that Weir could no longer work with Plaintiff. (Doc. # 16-5 at ¶ 4; Doc. # 16-4 at ¶

13). Weir and Yates also met on July 31, 2013. Either Weir or Yates[3] compiled notes from that meeting during which they discussed Plaintiff and Weir's complaints about her. (Doc. # 16-1 at ¶ 8; Doc. # 16-1 at pp. 000175-78). It is not clear how that discussion took place because Yates was out of the office that day. (Doc. # 16-5 at ¶ 4). Yates later gave a copy of the notes to Executive Director of Human Resources Ryland-Holmes. (Doc. # 16-1 at ¶ 8).

Also on July 31, 2013, Weir met with Ryland-Holmes to discuss what she had learned about Plaintiff's July 25, 2013 meeting with Yates. (Doc. # 16-1 at ¶ 7). Weir told Ryland-Holmes that she felt she could no longer trust Plaintiff and had decided to terminate her employment. (*Id.*). Ryland-Holmes informed Weir that she would need to discuss that proposed termination with Yates. (*Id.*). As Plaintiff's supervisor, it was Weir's decision whether to terminate Plaintiff's employment. (Doc. # 16-4 at ¶ 13; Doc. # 16-3 at 59:9-13). However, Weir was required to obtain approval from HR or the CEO of VIVA before implementing that decision; HR and the CEO could approve or reject a recommendation of termination. (Doc. # 16-4 at ¶ 13; *see* Doc. # 16-2 at ¶ 8). Ryland-Holmes did not make or participate in the decision to terminate Plaintiff. (Doc. # 16-1 at ¶ 10).

During the first week of August 2013, Plaintiff spoke and met with Manager of Human Resources Maria DePiano Arrington on multiple occasions. (Doc. # 16-2 at 104:14-109:10, 111:20-113:16, Exs. 19-21; Doc. # 19-1 at ¶ 16). They met August 2, 2013, regarding Plaintiff's concerns that Weir was giving her the "cold shoulder" and would not meet with Plaintiff. (Doc. # 16-2 at Ex. 19). Plaintiff felt like something was "going on" with Weir. (*Id.*). She was also concerned that Weir had found out about the meeting about reorganizing departments she had with Yates. (*Id.*; Doc. # 16-2 at 113:1-4). Plaintiff was shocked that Weir thought she had an attendance problem, and complained of Weir as being a "micro-manager" and "nano-manager."

[3] The Rule 56 evidence is not clear as to which one compiled the notes.

(Doc. # 16-2 at Ex. 19). Arrington suggested Plaintiff give Weir a few more days as Weir might still be catching up on work after her vacation, and suggested that Plaintiff let Weir know she took to heart their conversation regarding attendance on July 18, 2013. (*Id.*; *see also* Doc. # 16-4 at ¶ 9).

Arrington and Plaintiff spoke again on August 7, 2013. Plaintiff expressed concern that she felt "something was going on," and she still felt like Weir was giving her a "cold shoulder." (Doc. # 16-2 at Ex. 21). Plaintiff made statements questioning if "her days [were] numbered," and asked if Weir was trying to get rid of her. (*Id.*). Plaintiff was still worried and upset about Weir finding out about the meeting with Yates. (*Id.*).

**C. Plaintiff's Need for FMLA Leave**

Plaintiff's husband has severe neuropathy in his feet as a result of Type 2 diabetes. (Doc. # 16-2 at 61:1-20; Doc. # 19-1 at ¶ 4; Doc. # 19-2 at ¶¶ 2-4). Plaintiff anticipated taking FMLA leave in order to: assist her husband with, and oversee, his medication regimen; attend doctor's visits; and to provide him with comfort, support, hygiene, nutrition, safety, and transportation needs. (Doc. # 16-2 at 61:21-65:2; Doc. # 19-1 at ¶¶ 5-6; *see* Doc. # 19-2 at ¶¶ 6, 9). Plaintiff's husband's condition had been deteriorating, he had taken leave from his own job, he was on short-term disability, and he could not manage his health condition alone. (Doc. # 19-1 at ¶¶ 7-8; Doc. # 19-2 at ¶¶ 4-5, 8-9).

Plaintiff discussed the concerns she had about her husband's health with Weir on a regular basis, beginning in either 2012 or 2013. (Doc. # 19-1 at ¶ 10; Doc. # 16-2 at 130:4-132:2; Doc. # 16-3 at 55:3-21, 56:16-57:6). Weir does not recall if she ever personally advised Plaintiff of her right to take FMLA leave. (Doc. # 16-3 at 58:6-8; *see also* Doc. # 19-1 at ¶ 11). She did testify that Plaintiff never indicated to her that her husband's condition was worsening,

but that Weir "suppose[s]" that feet tingling meant his diabetes was getting worse. Doc. # 16-3 at 57:7-58:5).

Prior to her termination, Plaintiff attempted to schedule two meetings with Weir to discuss scheduling FMLA leave. (Doc. # 19-1 at ¶ 13; *see* Doc. # 16-2 at Ex. 19). Plaintiff sent Weir an email "calendar" request, which Weir denied without explanation. (*Id.*). She felt that Weir was ignoring her and giving her a "cold shoulder." (Doc. # 16-2 at Exs. 19, 21; Doc. # 19-2 at ¶¶ 13, 16).

On July 31, 2013 (the same day that Weir and Yates met, and Weir and Ryland-Holmes met, respectively), Plaintiff talked to Arrington, Manager of Human Resources Operations, to inquire about taking FMLA leave to care for her husband.[4] (Doc. # 16-2 at 56:16-57:16, 129:13-130:3; Doc. # 19-1 at ¶ 14; Doc. # 16-1 at ¶ 6; Doc. # 26-1 at ¶ 2). Plaintiff characterizes her discussion with Arrington as requesting FMLA leave. (Doc. # 16-2 at 129:13-22; Doc. # 19-1 at ¶ 4). After Plaintiff spoke with Arrington, Brandon Patterson, a member of Triton's Human Resources department, sent Plaintiff the FMLA forms she was required to complete and submit in order to be approved for leave under the FMLA Policy. (Doc. # 16-2 at 57:17-60:10, 130:2-3, Ex. 12; Doc. # 19-1 at ¶ 15; Doc. # 16-1 at ¶ 6). Plaintiff did not return the completed paperwork prior to her termination. (Doc. # 16-1 at ¶ 6).

Plaintiff had an appointment with her husband's physician scheduled for August 9, 2013, to obtain the requisite certification. (Doc. # 19-1 at ¶ 15; *see also* Doc. # 19-2 at ¶ 7). Plaintiff testified that she talked with HR one or two more times about trying to take leave before she was

[4] Plaintiff states Arrington told her to "try again" with Weir, and she did send another meeting request to Weir, but never was able to meet with her. (Doc. # 19-1 at ¶ 14). She does not indicate when this alleged set of events occurred. Arrington denies ever recommending that Plaintiff discuss a leave request with Weir or any other employee outside of HR. (Doc. # 26-1 at ¶ 3).

terminated. (Doc. # 16-2 at 60:11-23; Doc. # 19-1 at ¶ 17). Arrington denied having any further conversations with Plaintiff again about FMLA leave. (Doc. # 26-1 at ¶ 4).

**D. Plaintiff's Termination**

On August 5, 2013, after Yates returned to the office, Weir, Ryland-Holmes, and Yates met. (Doc. # 16-5 at ¶ 4; Doc. # 16-4 at ¶ 13). They discussed Weir's concerns with Plaintiff's communication style and "unacceptable behavior" toward co-workers, in addition to the complaints Weir had received from Plaintiff's co-workers. (*Id.*). Weir presented "documentation" of her concerns. (Doc. # 16-5 at ¶ 4). She recommended termination because she felt, "for multiple reasons," that Plaintiff could not effectively manage her department and because she lacked trust and confidence in Plaintiff as a supervisor. (Doc. # 16-4 at ¶¶ 13-14; Doc. # 16-5 at ¶ 4; Doc. # 16-3 at 59:9-16). Weir said she would not work with Plaintiff anymore and would not continue to work for VIVA if Plaintiff remained in her position reporting to Weir. (Doc. # 16-4 at ¶ 13).

Although Weir was aware of Plaintiff's husband's health issues, she was not aware that Plaintiff had referenced any need to take FMLA leave, or that she had inquired about such leave and requested forms, until after she recommended Plaintiff's termination. (Doc. # 16-3 at 58:9-14; Doc. # 16-4 at ¶ 14; Doc. # 26-1 at ¶ 6). Weir candidly admitted, however, that even if she had known, she would have still recommended termination for the reasons stated above. (Doc. # 16-4 at ¶ 14).

On August 7 and 8, 2013, Ryland-Holmes performed follow-up interviews with several of Plaintiff's co-workers and subordinates regarding her communication style and relationship with Weir. (Doc. # 16-1 at ¶ 9; Doc. # 16-5 at ¶ 5; Doc. # 26-2 at ¶ 5). Each employee Ryland-Holmes interviewed "echoed" Weir's concerns regarding Plaintiff's inappropriate

communication style and negative behavior. (*Id.*). These employees also reported that Plaintiff often criticized Weir. (*Id.*). Ryland-Holmes took notes and shared her findings with Yates. (*Id.*; Doc. # 16-1 at pp. 000153-74; *see also* Doc. # 16-6 at 18:10-15).

On August 7, 2013, Director of Provider Engagement Carol Davis emailed Yates, and Yates met with her the morning of August 8, 2013. (Doc. # 16-5 at ¶ 6). Davis complained about Plaintiff's "attitude or behavior" toward her. (Doc. # 16-6 at 16:10-14; Doc. # 16-5 at ¶ 6). Davis had no authority to make termination decisions regarding Plaintiff. (Doc. # 26-2 at ¶ 6).

On August 8, 2012, Yates approved Weir's recommendation that Plaintiff's employment be terminated "due to her inability to work with other employees and effectively manage her department." (Doc. # 16-5 at ¶ 7). She based her approval on the information she received from Weir, Davis, and Ryland-Holmes's investigations about Plaintiff's "negative personality and harsh communication style." (*Id.*). Yates was not aware that Plaintiff had discussed taking FMLA leave with HR personnel, and she had not had any conversations with Ryland-Holmes, Weir, or any other employee about Plaintiff's request for FMLA paperwork. (*Id.* at ¶ 8; Doc. # 26-1 at ¶ 6). Prior to Weir's recommendation of termination, Ryland-Holmes also had not had any such conversations with Yates, Weir, or other employees outside of HR about Plaintiff's request for FMLA paperwork. (Doc. # 16-1 at ¶ 11). Yates says she would have approved Weir's termination recommendation even if she had known about Plaintiff's request for FMLA paperwork because her termination decision was due to Plaintiff's "inability to work with other employees (including two of VIVA's most valued Executive Director level employees)" and "effectively manage her department." (Doc. # 16-5 at ¶ 8).

Yates met with Plaintiff on August 8, 2013, to terminate Plaintiff's employment. (Doc. # 19-1 at ¶¶ 18-19; Doc. # 16-5 at ¶ 7; Doc. # 16-1 at ¶ 10). Ryland-Holmes attended the meeting

as a witness. (Doc. # 16-1 at ¶ 10; Doc. # 19-1 at ¶ 19). Weir did not attend. (Doc. # 16-3 at 59:17-21). Yates informed Plaintiff that her employment was being terminated due to her inability to work with other employees and effectively manage her department. (Doc. # 16-1 at ¶ 10). Plaintiff states that Yates and Ryland-Holmes told her she was "no longer a fit" (Doc. # 19-1 at ¶ 19), and when she asked them what they meant by that, they responded that "several people" had complained about her. (*Id.* at ¶ 21).

Plaintiff was shocked. (*Id.* at ¶ 19). At the time of her termination, at Weir's suggestion and with her approval, Plaintiff had been scheduled to attend two out-of-town conferences in the Fall of 2013. (*Id.* at ¶ 20; *see* Doc. # 16-2 at 125:20-126:15, Ex. 24). Yates apologized to Plaintiff and told Plaintiff that she had "done so much" for the company. (Doc. # 19-1 at ¶ 21). Yates and Ryland-Holmes gave Plaintiff the option of resigning and signing a full release, but Plaintiff declined to do so. (*Id.* at ¶ 23). Plaintiff asked Yates and Ryland-Holmes if they were aware of her interest in taking FMLA leave and request for paperwork. (*Id.* at ¶ 22). They did not respond, and Ryland-Holmes left the meeting. (*Id.*). Plaintiff's Termination of Employment form, which she did not sign, states only that she was "Discharged (Involuntary)." (Doc. # 19-12).

## III. The Motions to Strike

Both parties filed motions to strike various portions of the evidentiary submissions. (Docs. # 27, 32). In her motion to strike, Plaintiff argues that numerous portions of the declarations submitted by Defendant "contain inadmissible hearsay, irrelevant or immaterial information, conclusory statements, lack relevant firsthand knowledge, attempt to authenticate documents not authored or created by the declarant, and attempt to make inadmissible legal conclusions." (Doc. # 32 at p. 2). She also contends that the Declaration of Lesley Weir (Doc. #

16-4) should be stricken in its entirety because it was executed before Plaintiff filed this case. (Doc. # 32 at p. 3).

In its motion, Defendant contends that Plaintiff's Declaration (Doc. # 19-1) contains contradictory statements, irrelevant evidence, and conclusory allegations, and that Plaintiff's Exhibits 4-10 and 12-14 (Docs. # 19-3 through 19-9, and 19-11 through 19-13) should be stricken because they lack proper authentication under Federal Rule of Civil Procedure 56(e) and Federal Rule of Evidence 901. (Doc. # 27 at pp. 1, 5-6). Both sides' arguments are without merit.

Federal Rule of Civil Procedure 56 is clear that affidavits or depositions containing conclusory arguments, as opposed to statements of fact based on personal knowledge, are improper. *Walton v. Neptune Tech. Grp., Inc.*, No. 08-cv-5, 2009 WL 3379916, at *1 (M.D. Ala. Oct. 19, 2009) (citations omitted). Although testimony violating these standards may be subject to a motion to strike, the "court need not strike the entire affidavit or deposition, rather it may strike *or disregard* the improper portions and consider the remainder of the testimony." *Id.* (citation omitted). The court is able to determine when testimony and statements contained in the parties' evidentiary submissions are conclusory or irrelevant and due to be disregarded, without striking such evidence.

Courts may consider hearsay on summary judgment so long as the statement can be reduced to admissible form at trial. *See, e.g., Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293-1294 (11th Cir. 2012) ("a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form[ ]"); *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999) (same). Similarly, even unauthenticated or otherwise inadmissible evidence is properly

considered on summary judgment so long as it can be reduced to admissible form at trial. *See, e.g., Rowell v. BellSouth Corp*., 433 F.3d 794, 800 (11th Cir. 2005) (on summary judgment, courts consider "evidence which can be reduced to an admissible form"); *Longcrier v. HL–A Co., Inc*., 595 F.Supp.2d 1218, 1223 (S.D. Ala. 2008) ("The general rule in this Circuit is that parties' exhibits may be considered for purposes of pretrial rulings so long as they can be reduced to admissible form at trial[ ]"). Again, the court can determine, without striking, what, if any, hearsay testimony would be inadmissible at trial and thus inappropriate to consider at the summary judgment stage.[5]

As to conflicting evidence in the Rule 56 record, it is axiomatic that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000) (citation omitted). Where evidence is conflicting on a material issue, the court has not concluded that the fact at issue is established for purposes of summary judgment. Where otherwise admissible conflicting evidence is presented, that evidence goes to whether summary judgment should be granted, not whether the evidence should be stricken.

Plaintiff's assertion that the Declaration of Lesley Weir should be stricken because it was prepared prior to the initiation of this case, and because it was not disclosed in discovery, is misplaced. First, there is nothing suspicious about an employer anticipating litigation may come from a terminated employee. And, as Weir's declaration reveals, it was obtained shortly after Weir voluntarily resigned her employment with Defendant and, thus, Defendant was faced with the possibility that Weir might no longer have been readily available as a witness. (Doc. # 16-4).

[5] To remind the parties, it is the court and not the jury or the parties which is the "gatekeeper" and therefore rules on the admissibility of statements under the rules of evidence at trial. That gatekeeper role does not disappear when evidentiary materials are presented for summary judgment purposes.

Second, by its terms, Federal Rule of Civil Procedure 26(a)(3) does not require disclosure of evidence to be used solely for impeachment purposes. Finally, Plaintiff deposed Weir (Doc. # 16-3) and had a full and fair opportunity to question Weir on any matters related to Plaintiff's employment with Defendant, including her request for FMLA forms, and termination. Thus, even if Defendant's failure to provide the Weir Declaration was inappropriate, that failure is "harmless." Fed. R. Civ. P. 37(c)(1). The Weir Declaration will not be stricken.

Finally, Defendant argues that ten of Plaintiff's exhibits should be stricken because they lack proper authentication.[6] (Doc. # 27 at p. 1). It does not appear that the actual authenticity of the documents is at issue. To be sure, Plaintiff simply has proffered these ten exhibits without any attempt at authentication. But, Defendant's argument misses the mark by a wide margin. As a general rule, Federal Rule of Civil Procedure 56(e) requires documents to be properly authenticated before they may be considered at the summary judgment stage. *Bozeman v. Orum*, 199 F. Supp. 2d 1216, 1222 (M.D. Ala. 2002) (citation omitted). But federal courts routinely consider unauthenticated documents on motions for summary judgment, for example, when it is apparent (as it is here) that such documents are capable of reduction to admissible, authenticated form. *See, e.g.*, Rule 56(c)(2), Fed.R.Civ.P. ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); *Johnson v. Mobile Infirmary Medical Center*, 2015 WL 1538774, *1 (S.D. Ala. Apr. 7, 2015) ("It is well settled that exhibits are properly considered for summary judgment purposes as long as they may be reduced to admissible form at trial."). Although Defendant has objected to Plaintiff's reliance on unauthenticated documents, it is apparent to the court that the challenged

[6] The court finds it curious that some of the exhibits Defendant seeks to strike (Docs. # 19-3, 19-9) are exhibits to Lindsey Weir's and Plaintiff's depositions, which Defendant itself has submitted as evidence. (Doc. # 16-3 at Ex. 1, Doc. # 16-2 at Exs. 17, 18).

documents can be reduced to admissible, authenticated form at trial.[7] Moreover, the very documents Defendant seeks to strike were produced by Defendant.[8] Therefore, Defendant's argument that these documents should be stricken is not only without merit, but also it is wholly curious.

Accordingly, for all the foregoing reasons, both Plaintiff's and Defendant's Motions to Strike are due to be denied.

## IV. Summary Judgment Standard

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. Once the moving party has met its burden, Rule 56(c) requires the non-moving party to go beyond the pleadings and – by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file – designate specific facts showing that there is a genuine issue for trial. *See id.* at 324.

---

[7] Plaintiff also seeks to strike an exhibit to the Declaration of Cindy Ryland-Holmes (Doc. # 16-1) as improperly authenticated. (Doc. # 32 at p. 4). That exhibit is handwritten notes by Lindsey Weir given to Ryland-Holmes. (Doc. # 16-1). Yet, Plaintiff filed that exact same set of handwritten notes in support of her Motion. (Doc. # 19-5).

[8] The court considered setting these Motions for a hearing to determine what documents the parties truly contend are subject to some authenticity objection. The moving party would then be paying for an authentication deposition, with a sanction of a payment to be made to an appropriate charity. But the court concluded that the parties would be satisfied with a denial of their motions to strike instead.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("*Anderson*"). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *See Allen v. Bd. of Pub. Educ. For Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine, "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc.*, 131 F.3d 995, 999 (11th Cir. 1997). As *Anderson v. Liberty Lobby, Inc.*, teaches, under Rule 56(c) a plaintiff may not simply rest on her allegations made in the complaint; instead, as the party bearing the burden of proof at trial, she must come forward with at least some evidence to support each element essential to her case at trial. *See Anderson*, 477 U.S. at 252. "[A] party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 248 (citations omitted).

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Southwest Airlines Co.*, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing *Anderson*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Sawyer*, 243 F. Supp. 2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc.*, 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## V. The Cross Motions for Summary Judgment

In this case, both parties have moved for summary judgment. Plaintiff contends she is entitled to summary judgment because she can establish a claim of FMLA interference and retaliation as a matter of law, and (she argues) it is undisputed that Defendant's reasons for terminating her were merely pretextual.[9] Defendant argues that Plaintiff failed to establish either her FMLA interference claim or her FMLA retaliation. Defendant further argues that, even if she could establish a *prima facie* case of retaliation, Defendant's reason for terminating her was legitimate and non-retaliatory, and not pretextual. The court addresses the FMLA interference

[9] Plaintiff's argument is misguided. Plaintiff's argument is based primarily on an absence of documented counseling from Defendant, and bolstered by evidence that Plaintiff was scheduled to attend certain conferences in the future at the time of her termination. Plaintiff apparently misapprehends what is required to establish pretext. In order to demonstrate pretext, a plaintiff must show that the employer's offered reason was not the true reason for its decision, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jackson v. State of Ala. State Tenure Comm'n*., 405 F.3d 1276, 1289 (11th Cir. 2005) (quotation omitted). Importantly, conclusory allegations of discrimination, without more, are insufficient to show pretext. *Mayfield v. Patterson Pump Co*., 101 F.3d 1371, 1376 (11th Cir. 1996). A plaintiff's showing that an employer's proffered reason is unpersuasive does not necessarily establish that the plaintiff's proffered reason is correct; a district court still must conclude that the employer's real reason was impermissible. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524, 113 S. Ct. 2742, 2756, 125 L. Ed. 2d 407 (1993). Plaintiff's denial that her performance was deficient is simply insufficient to establish pretext. *See Smith v. Papp Clinic, P.A*., 808 F.2d 1449, 1452–53 (11th Cir.1987)("[I]f the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race' ").

and retaliation claims in turn below. For the following reasons, the court concludes that Defendant's Motion is due to be granted, and Plaintiff's Motion is due to be denied.

**A. Plaintiff Cannot Establish a FMLA Interference Claim**

To establish an FMLA interference claim, a plaintiff must establish that she was denied a leave benefit to which she was entitled. *Strickland v. Water Works & Sewer Bd. of City of Birmingham*, 239 F.3d 1199, 1206-07 (11th Cir. 2001) (citations omitted). "The employee need not allege that [her] employer intended to deny the benefit, because 'the employer's motives are irrelevant.'" *Hawkins v. BBVA Compass Bancshares, Inc.*, 2014 WL 4715865, at *15 (N.D. Ala. Sept. 22, 2014) (quoting *Strickland*, 239 F.3d at 1208), *aff'd*, 613 Fed. Appx. 831 (11th Cir. 2015) (*per curiam*).

In *Krutzig v. Pulte Home Corp.*, 602 F.3d 1231, 1236 (11th Cir. 2010), the Eleventh Circuit held that "the right to commence FMLA leave is not absolute, and that an employee can be dismissed, preventing her from exercising he right to commence FMLA leave, without thereby violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave." *Krutzig*, 602 F.3d at 1236. In other words, the FMLA does not "protect deficient employees from adverse employment actions, such that those workers could actually attain job security by seeking leave under the FMLA." *Schaaf v. Smithkline Beecham Corp.*, 602 F.3d 1236, 1242 (11th Cir. 2010).

In her Motion for Summary Judgment, Plaintiff argues that she is entitled to judgment as a matter of law on her interference claim because she was terminated after requesting FMLA leave forms from Defendant's human resources department. In her response to Defendant's Motion for Summary Judgment, Plaintiff supplements this position by arguing that she can show FMLA interference in three ways: (1) Defendant failed to advise her of her FMLA rights, (2)

Defendant failed to respond to her requests for FMLA leave, and (3) Defendant terminated her before she could commence FMLA leave. The court addresses each of these contentions below.

Plaintiff's argument that Defendant did not advise her of her FMLA rights or respond to her requests for leave are inapposite. Plaintiff received Defendant's Employee Handbook and signed acknowledgments that she understood and would follow Defendant's FMLA policy. (Doc. # 16-1 at ¶ 4; Doc. # 16-2 at 50:4-53:1, 54:11-55:2, Exs. 8-10, Ex. 11 at pp. 39-43). She also testified that she understood that, under Defendant's FMLA Policy, FMLA leave is not automatic. (Doc. # 16-1 at 55:3-7, Ex. 11 at pp. 40-4). Whether or not Weir advised her of her FMLA rights is irrelevant. Plaintiff received Defendant's policy, and under that policy, Weir's input was unnecessary. (*See* Doc. # 16-2 at Ex. 11 at pp. 39-43). In addition, Plaintiff was aware that HR handled FMLA requests. (Doc. # 16-2 at 56:9-12, Ex. 11 at pp. 40-42). Indeed, on July 31, 2013, Plaintiff talked to Arrington in HR to inquire about taking FMLA leave, and HR provided her the requisite FMLA forms. (Doc. # 16-2 at 56:16-60:10, 129:13-130:3, Ex. 12; Doc. # 19-1 at ¶¶ 14-15; Doc. # 16-1 at ¶ 6; Doc. # 26-1 at ¶ 2). Thus, it is undisputed on this record that Defendant advised Plaintiff of her FMLA rights, and responded to her inquiry about leave by providing her with the forms necessary to request leave.

In light of these undisputed facts, all that remains of Plaintiff's interference claim is her contention that Defendant interfered with her FMLA rights by terminating her employment. "[T]he right to commence FMLA leave is not absolute, and [] an employee can be dismissed, preventing her from exercising he right to commence FMLA leave, without [] violating the FMLA, if the employee would have been dismissed regardless of any request for FMLA leave." *Krutzig*, 602 F.3d at 1236. "Thus, Plaintiff's FMLA claims essentially merge into one claim," which "sounds in retaliation, not interference." *Hawkins*, 2014 WL 4715865, at *16. Because

"her interference claim is largely a clone of her FMLA retaliation claim," Plaintiff's interference claim based on her termination fails as a matter of law, and the question *vel non* is whether Defendant retaliated against her.[10]

**B. Plaintiff's FMLA Retaliation Claim Is Due To Be Dismissed**

"The prima facie case of retaliation under the FMLA is the same as under Title VII [of the Civil Rights Act of 1964] and requires a showing of (1) statutorily protected conduct, (2) adverse employment action, and (3) causation." *Penaloza v. Target Corp.*, 549 Fed. Appx. 844, 847-48 (11th Cir. 2013) (citing *Krutzig*, 602 F.3d at 1234-35); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Once a plaintiff successfully makes out a prima facie case, the burden shifts to the employer "to articulate a legitimate reason for the adverse action." *Martin v. Brevard Cty. Public Schools*, 543 F.3d 1261, 1268 (11th Cir. 2008) (citation omitted). If the employer does so, the employee must then show that the employer's proffered reason was pretextual by presenting evidence "sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." *Id.* In making this showing, the employee must show that her employer intentionally discriminated against her for exercising a FMLA right. *Id.* at 2167 (citing 29 U.S.C. § 2615(a)(2); 29 C.F.R. § 825.220(c)). If the proffered reason is one that might motivate a reasonable employer, however, the plaintiff must "meet it head on and rebut it" instead of merely quarreling with it. *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1099 (11th Cir. 2004). Of course, a finding that the proffered reason is false does not compel an inference of retaliation,

[10] Even if Plaintiff's interference claim were not essentially a retaliation claim, Defendant would still be entitled to summary judgment on it. This is because the Rule 56 evidence demonstrates that Plaintiff would have been terminated regardless of her inquiries into FMLA leave. The FMLA does not "protect deficient employees from adverse employment actions, such that those workers could actually attain job security by seeking leave under the FMLA." *Schaaf*, 602 F.3d at 1242. And, as explained more fully below, Plaintiff has failed to present sufficient Rule 56 evidence that the stated reason for her termination was pretextual. Accordingly, her interference claim is also due to be dismissed on this alternative ground.

because the burden of proving retaliatory intent remains at all times with the employee. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

### 1. Plaintiff Has Not Established a Prima Facie Case

Plaintiff contends that she has established a prima facie case and points particularly to the short temporal proximity (*i.e.*, approximately one week) between request for FMLA leave and her termination. Defendant disagrees and suggests that Plaintiff has attempted to orchestrate a causal connection based upon timing. But it is not for this court to make a credibility determination about why Plaintiff went to Arrington to inquire about FMLA leave. That is the good news for Plaintiff. The bad news, however, is that despite that acknowledgement she still cannot establish the causation element of her prima facie case.

Arrington was aware of Plaintiff's request for leave, but Arrington was not a decision maker in this case. Conversely, Weir and Yates were decision makers, but were not aware of Plaintiff's request for FMLA forms. To establish causation, Plaintiff must show that the decision-makers were aware of her protected conduct. *Stone v. Geico Gen. Ins. Co.*, 279 F. App'x 821, 823 (11th Cir. 2008) (the protected activity must be known to the decision-maker who takes the adverse action). Here, no causal connection has been established. Therefore, Plaintiff has failed to establish a prima facie case.

### 2. Plaintiff Has Failed to Establish Defendant's Reason for Her Termination is a Pretext

Assuming for the sake of argument that Plaintiff has established a prima facie case of retaliation (and, to be clear, she has not), there is no Rule 56 evidence suggesting that Defendant's proffered reason for terminating her employment is pretextual. Defendant has explained that it terminated Plaintiff's employment due to her poor professional behavior and improper style of communication as an employee and manager. The undisputed record evidence

shows that Weir, Plaintiff's supervisor, and Yates, Weir's supervisor, already had concerns about Plaintiff's effectiveness prior to July 2013. Furthermore, Defendant has presented evidence that other employees complained about Plaintiff's leadership and professional demeanor. (*See* Doc. # 16-4 at ¶¶ 4-5; Doc. # 16-1 at ¶ 9, pp. 000153-74; Doc. # 16-5 at ¶ 5; Doc. # 26-2 at ¶ 5). Not only has Defendant articulated a legitimate, non-retaliatory reason for Plaintiff's termination, but also it has presented undisputed evidence in support of that reason.

Therefore, the burden shifts back to Plaintiff to show that Defendant's reason for her termination was merely pretextual. In her summary judgment motion, Plaintiff argues that Defendant's proffered reason is pretextual because she received good performance reviews during her time of employment with no negative write-ups, and because she had been approved by Weir to attend two conferences at the time of her termination. Further, Plaintiff contends that the timing of the investigation into her performance is suspect.

As Defendant admits, Plaintiff had received good performance reviews for 2011 and 2012. (Doc. # 16-3 at 35:10-47:7, Ex 1 at pp. 000093-94, 120-24, 238-43). And, as Plaintiff argues, Defendant does not have many written examples of discipline which it issued to Plaintiff. Nevertheless, Defendant has presented substantial evidence of complaints from Plaintiff's coworkers and subordinates from 2013, the year Plaintiff was terminated, independent of her performance reviews. (*See* Doc. # 16-4 at ¶¶ 4-5; Doc. # 16-1 at ¶ 9, pp. 000153-74; Doc. # 16-5 at ¶ 5; Doc. # 26-2 at ¶ 5). Thus, while documentation of discipline is certainly a prudent HR practice, the court's role is to assess whether unlawful practices under the FMLA have occurred, "not to act as a super personnel department that second-guesses employers' business judgments." *Wilson*, 376 F.3d at 1092. The burden is on Plaintiff to present evidence that Defendant's reason was not the true reason for its decision, "either directly by persuading the court that a

discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Jackson v. State of Ala. State Tenure Comm'n.*, 405 F.3d 1276, 1289 (11th Cir. 2005) (quotation omitted). This, she has failed to do.

Moreover, and in any event, even if the actual reason for Defendant's termination of Plaintiff were not what it has stated, Plaintiff has not shown by a preponderance of the evidence that her inquiries into FMLA leave were the real reason for her termination. Again, Plaintiff had inquired about FMLA leave and timely received the requisite paperwork under Defendant's policy. She did not, however, return the completed paperwork prior to her termination. (Doc. # 16-1 at ¶ 6).

Moreover, although Yates and Ryland-Holmes were present for Plaintiff's termination meeting, and informed Plaintiff of her termination, Plaintiff concedes that Weir was the final decision maker regarding her termination. (Doc. # 28 at ¶ 19) ("Weir made the 'final' decision to terminate Plaintiff's employment, according to Defendant's own sworn interrogatory responses."). Plaintiff also agrees that, although Weir was required to secure Yates's approval before she could implement the decision, "according to Ryland-Holmes, Weir made the decision to terminate Plaintiff on July 31, 2013, the very day Plaintiff received FMLA paperwork." (*Id.*). The court agrees that the undisputed facts in the Rule 56 record plainly show that Weir was the final decision maker on Plaintiff's employment, subject to Yates's approval. (Doc. # 16-4 at ¶ 13). The Rule 56 evidence demonstrates that Weir had no knowledge of Plaintiff's request to HR for FMLA leave papers and, even if she did have that knowledge, she would have still recommended termination. (Doc. # 16-3 at 58:9-14; Doc. # 16-4 at ¶ 14; Doc. # 26-1 at ¶ 6). It is likewise undisputed that Yates had no knowledge of Plaintiff's request to HR for FMLA leave papers, but even if she had, she would have approved the termination decision in any event.

(Doc. # 16-5 at ¶ 8; Doc. # 26-1 at ¶ 6). Finally, even if Ryland-Holmes were aware of Plaintiff's FMLA request, she testified that she did not share that knowledge with Weir or Yates. (Doc. # 16-1 at ¶¶ 9-11).

After careful review, the undisputed Rule 56 evidence shows that the decision to terminate Plaintiff's employment was made for legitimate business reasons by those who did not know of her FMLA inquiries, and she has failed to show that the reasons given for her termination were pretextual. Therefore, Defendant is entitled to summary judgment on Plaintiff's retaliation claim.

## VI. Conclusion

For all these reasons, the parties' Motions to Strike (Docs. # 27 and 28) and Plaintiff's Motion for Summary Judgment (Doc. # 17) are due to be denied. Defendant's Motion for Summary Judgment (Doc. # 14) is due to be granted.

A separate order will be entered.

**DONE** and **ORDERED** this September 6, 2016.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE